## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JAMES HUBERT,

               Plaintiff,

     v.

ANTHONY LUSCAVAGE, et al.,

              Defendants.

CIVIL ACTION NO. 3:21-CV-01523

(MEHALCHICK, M.J.)

### MEMORANDUM

Before the Court are motions for summary judgment filed by Plaintiff James Hubert ("Hubert") and Defendants Nicholle Boguslaw[1] ("Boguslaw") and Dr. Rottmann ("Dr. Rottmann") (collectively, "Defendants") (Doc. 52; Doc. 58), along with a motion to appoint counsel filed by Hubert. (Doc. 51).

This case is a *pro se* civil rights action initiated by Hubert upon the filing of the original complaint pursuant to 42 U.S.C. § 1983 in this matter on August 12, 2020, in the Court of Common Pleas of Northumberland County against Defendants Anthony Luscavage ("Luscavage"), Karen Merritt-Scully ("Merritt-Scully"), Boguslaw, Dr. Rottmann, and an unidentified health care provider for the Department of Corrections ("DOC")[2]. (Doc. 1-2). The action was removed to the United States District Court for the Middle District of Pennsylvania on September 3, 2021. (Doc. 1). On January 26, 2022, Hubert filed the operative second amended complaint, adding the additional Defendants Unit Manager Biscoe

---

[1] Boguslaw is misidentified in the caption of this action and in other filings as Nicole Boguslaw.

[2] The unidentified health care provider for DOC was terminated from this action on January 26, 2022.

("Biscoe") and Major Foulds ("Foulds"). (Doc. 23). All parties have consented to proceed before the undersigned United States Magistrate Judge pursuant to Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). (Doc. 27).

For the following reasons, Hubert's motion for summary judgment shall be **DENIED** (Doc. 52), Defendants' motion for summary judgment shall be **GRANTED** (Doc. 58), and Hubert's motion to appoint counsel shall be **DENIED** as **MOOT** (Doc. 51).

I.    BACKGROUND AND PROCEDURAL HISTORY

Hubert filed his original complaint in this matter on August 12, 2020, in the Court of Common Pleas of Northumberland County against Luscavage, Merritt-Scully, Boguslaw, Dr. Rottmann, and an unidentified health care provider for the DOC. (Doc. 1-2). In the original complaint, Hubert alleged all the defendants intentionally deprived him of medical care when his asthma medication and treatment were discontinued, violating his rights under the United States and Pennsylvania Constitutions. (Doc. 1-2).

The action was removed to the United States District Court for the Middle District of Pennsylvania on September 3, 2021. (Doc. 1). On September 9, 2021, Luscavage and Merritt-Scully filed a motion to dismiss. (Doc. 6). In response, Hubert filed an amended complaint on January 4, 2023, and then a second amended complaint on January 26, 2022. (Doc. 19; Doc. 23). The second amended complaint seeks to incorporate the amended complaint by reference and adds Biscoe and Foulds as Defendants.[3] (Doc. 23, at 1). In addition to the causes of action set forth in the original complaint, in his amended complaint Hubert alleges Biscoe

---

[3] For the purpose of this motion for summary judgment, and in consideration of a *pro se* plaintiff's liberal pleading standard, the Court will consider the amended complaint as incorporated into the second amended complaint. (Doc. 19; Doc. 23).

and Foulds failed to protect him from the transmission of COVID-19. (Doc. 23, at 2-3). As relief, Hubert seeks monetary compensation. (Doc. 23, at 3).

Defendants Boguslaw and Dr. Rottmann filed their answer to the second amended complaint on February 3, 2022. (Doc. 24). On January 25, 2023, Defendants Biscoe, Foulds, Luscavage, and Merritt-Scully filed a motion to dismiss. (Doc. 40). In response, on March 24, 2023, Hubert filed a motion for summary judgment. (Doc. 42). On June 30, 2023, the Court denied Hubert's motion for summary judgment and granted Defendants Biscoe, Foulds, Luscavage, and Merritt-Scully's motion to dismiss, terminating these defendants from the action. (Doc. 40; Doc. 42; Doc. 49; Doc. 50).

On October 2, 2023, Hubert filed a motion to appoint counsel, a motion for summary judgment, a brief in support, and a concise statement of material facts. (Doc. 51; Doc. 52; Doc. 53; Doc. 54; Doc. 55-1; Doc. 55-2; Doc. 55-3; Doc. 55-4; Doc. 55-5; Doc. 55-6; Doc. 55-7; Doc. 55-8; Doc. 55-9; Doc. 55-10; Doc. 55-11; Doc. 55-12). On October 5, 2023, Defendants filed a cross motion for summary judgment, a brief in support, a statement of facts, and accompanying exhibits. (Doc. 58; Doc. 59; Doc. 59-1; Doc. 60). On October 24, 2023, Defendants filed a brief in opposition to Hubert's motion for summary judgment. (Doc. 63). As of the date of the Memorandum, Hubert has not filed to file a brief in opposition to Defendants' motion for summary judgment. Accordingly, this matter is ripe for discussion.

## II.   STANDARDS OF REVIEW

### A.  MOTION FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might

affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." *See* M.D. Pa. L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant. These rules apply with equal force to all parties. *Morrison v. United States*, No. 1:20-CV-01571, 2021 WL 4192086, at *3 (M.D. Pa. Sept. 15, 2021) (citing *Mala v. Crown Bay Marina*, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants")).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249.

Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,* *477 U.S. at 249*.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories, or the like to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony . . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment."). With the aforementioned standards in mind, a document filed *pro se* is "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

B. Section 1983 Standard

Hubert asserts his federal civil rights claims pursuant to 42 U.S.C. § 1983. (Doc. 11).

Section 1983 provides a private cause of action for violations of federal constitutional rights.

The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

> 42 U.S.C. § 1983.

Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To succeed on a § 1983 claim, a plaintiff must demonstrate that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

III. Statements of Material Facts

A. Hubert's Statement of Material Facts

The following factual summary is taken both from Hubert's statement of facts and his brief in support of his motion for summary judgment. (Doc. 53; Doc. 54). While Hubert filed a document called "Plaintiff's Declaration of the Concise Statement of Material Facts," therein he failed to indicate "the parts of the record that support [his] statements" or provide citations to any of his attached exhibits for the Court. (Doc. 54; Doc. 55). *See* Local Rule 56.1. In his brief in support, however, Hubert provides an enumerated list of facts that does include some citations to his attached exhibits. (Doc. 53, ¶¶ 1-16; Doc. 55). While it is "not the Court's

6

independent obligation, to support Plaintiff's allegations with evidence of record," because Hubert is proceeding *pro se* and the Court is required to liberally construe his pleadings, the Court will, to the best of its ability, review the record to assess the assertions contained in Hubert's Declaration of the Concise Statement of Material Facts and the enumerated facts listed in his Brief in Support. (Doc. 53, ¶¶ 1-16; Doc. 54); *Yan Yan v. Penn State University*, 2012 WL 3201888, at *5 n.5 (M.D. Pa. Aug. 3, 2012).

### 1. Hubert's Declaration of the Concise Statement of Material Facts

Hubert, who is incarcerated at SCI-Coal Township, is the Plaintiff in this case. (Doc. 54, ¶¶ 1, 3; Doc. 1). Hubert's original complaint alleged Dr. Rottmann and Boguslaw removed his "longstanding asthma diagnosis, medications, and treatment(s) that were under 'chronic care' in January 2020." (Doc. 54, ¶¶ 1, 5; Doc. 1). Dr. Rottmann did so "while simultaneously writing a prescription for a sleep study to be performed due to [Hubert's] symptoms of breathing difficulties, chronic fatigue, and loud snoring at night during sleep." (Doc. 54, ¶ 5). These symptoms led Hubert to seek the care of Dr. Rottmann. (Doc. 54, ¶ 5)

According to Hubert, the "removal" of his asthma diagnosis, medications, and treatments was done without due process or his consent. (Doc. 54, ¶ 1). Defendants denied Hubert "necessary medical care" by going against his "long-standing medically prescribed treatments." (Doc. 54, ¶ 1). Defendants took these measures due to budgetary considerations. (Doc. 54, ¶ 4).

Hubert's original complaint details how Defendants denied and delayed his necessary medical care and "egregiously violated" his "Medical and Civil Rights" in February 2020. (Doc. 54, ¶¶ 2, 3; Doc. 1). As a result of not being properly treated for his "unknown disease(s) and /or infections(s) of the upper and lower respiratory tract for over thirty (30) days," Hubert

states he suffered "severe coughing spells and chronic pain." (Doc. 54, ¶ 4). This lack of treatment amounted to "wanton neglect." (Doc. 54, ¶ 4). After the diagnosis of his upper/lower respiratory infection(s), Hubert was denied both his asthma diagnosis and medications, up until August of 2020. (Doc. 54, ¶ 6). This compelled Hubert to submit multiple Grievances to the Department of Corrections and to initiate this action in state court before the Northumberland County Court of Common Pleas. (Doc. 54, ¶ 6).

Between February 2020 and August 2020, Hubert claims "Medical Staff personnel knew that [his] results of having sleep apnea was exacerbated by "having a comorbidity like asthma, but without the diagnosis, [Hubert] would not be provided with a CPAP machine to help breathing[.]" (Doc. 54, ¶ 7).

According to Hubert. When his asthma diagnosis was reinstated in August 2020, he "was never informed that he had sleep apnea and could be provided with a CPAP machine to help with his breathing issues." (Doc. 54, ¶ 8). Instead, the Medical Department denied the fact that Hubert needed a CPAP, even though it was recommended, and he was complaining about his symptoms. (Doc. 54, ¶ 8).

## 2.   Enumerated Facts in Hubert's Brief in Support

Hubert went to the Medical Department for "Chronic Care" on November 4, 2019, complaining of symptoms of daytime sleepiness, snoring, racing heart, and not being able to breathe at night. (Doc. 53, ¶ 2; Doc. 55-1). At that time, Hubert was told he needed to lose weight before a sleep study could be performed. (Doc. 53, ¶ 2; Doc. 55-1). This "diagnosis was rendered despite the fact that Hubert was previously seen by Dr. Rottmann on [October 16, 2019], for 'Chronic Care' for asthma." (Doc. 53, ¶ 3; Doc. 55-2).

On February 5, 2020, ten days before Hubert became sick with a respiratory illness for more than thirty days, Dr. Rottmann saw Hubert for "the same above-mentioned symptoms" and Hubert was referred for a sleep study. (Doc. 53, ¶ 4; Doc. 55-3). At that time, Dr. Rottmann explained the risks of not losing weight. (Doc. 53, ¶ 4; Doc. 55-3).

On February 25, 2020, Hubert engaged in a sleep study and was diagnosed with Obstructive Sleep Apnea ("OSA") (mild), and was "recommended for continuous airway pressure devices ("CPAP") . . . but [] was denied and delayed for over two (2) years with treatment for this diagnosis." (Doc. 53, ¶ 6; Doc. 55-4).

According to documentation, Hubert was allegedly removed from his "Chronic Care" diagnosis of asthma because he was not compliant with taking his prescribed an inhaler for sudden breathing issues. (Doc. 53, ¶ 10; Doc. 55-5).

Dr. Rottmann "removal" of Hubert's asthma diagnosis on October 16, 2019, but the medication in question, "Xopenex," was prescribed and detailed as: "RX; One Puff(s) four times daily (QID) as needed for shortness of breath." (Doc. 53, ¶ 11; Doc. 55-6).

After Hubert filed this case in the Northumberland County Court of Common Pleas in August 2020, Dr. Rottmann placed the Plaintiff back on "Chronic Care" for his asthma. (Doc. 53, ¶ 15; Doc. 55-8).

B. Defendants' Statement of Material Facts

1. **Case Overview**

The following factual summary is taken from Defendants' statement of material facts. (Doc. 59). On September 3, 2021, this case was removed to the United States District Court for the Middle District of Pennsylvania. (Doc. 59, ¶ 1; Doc. 1). Hubert filed an amended complaint on January 4, 2022, and a second amended complaint on January 26, 2022. (Doc.

59, ¶¶ 2, 3; Doc. 19; Doc. 23). In Hubert's amended complaints, he alleges that Defendants were deliberately indifferent to his serious medical need for treatment of his asthma because they removed him from the pulmonary chronic care clinic. (Doc. 59, ¶ 4; Doc. 19, ¶¶ 9-15). Hubert alleges also that he contracted Covid-19 but was denied treatment or was given delayed treatment because the prison was understaffed and overworked. (Doc. 59, ¶ 4; Doc. 19, ¶¶ 6-15). Hubert alleges this caused him injury and emotional suffering. (Doc. 59, ¶ 4; Doc. 19, ¶¶ 6-15). Because at all relevant times Hubert was incarcerated at SCI- Coal Township, his medical records from the Pennsylvania DOC provide insight regarding the medical care Defendants provided to him. (Doc. 59, ¶ 5; Doc. 59-1).

### 2. Dr. Rottmann's Examinations of Hubert

On October 16, 2019, Hubert was first seen by Dr. Rottmann [4] for Hypertension & Cardiac and Pulmonary Chronic Care. (Doc. 59, ¶ 48; Doc. 59-1, at 221-28). At that time, Dr. Rottmann noted that Hubert had been hospitalized for asthma five years prior with intubation and that none of Hubert's first-degree relatives had asthma. (Doc. 59, ¶ 48; Doc. 59-1, at 221-28). Dr. Rottmann further noted that Hubert had an "improved—less severe" diagnosis of asthma which could be triggered by cold and that Hubert experienced asthma symptoms less than two days per week, nightmare awakenings less than twice per month, had a SABA rescue inhaler that he used less than two days per week, and that Hubert had minor limitation on his active daily living. (Doc. 59, ¶ 48; Doc. 59-1, at 221-28). At the appointment, Hubert's vitals were stable and his systems were normal, and Dr. Rottmann's assessment was

---

[4] Defendants switch their spelling between "Dr. Rottman" and "Dr. Rottmann" throughout their filings. Consistent with our previous memorandum, the Court here will use Dr. Rottmann.

hypertension, with poor blood pressure, worsened hypertension, and intermittent asthma. (Doc. 59, ¶ 48; Doc. 59-1, at 221-28). Dr. Rottmann did not prescribe any medication but educated Hubert on die, nutrition, and exercise. (Doc. 59, ¶ 48; Doc. 59-1, at 221-28). Following the clinic appointment, Dr. Rottmann ordered Hubert an annual hypertension lab test to assess Hubert's hypertension and asthma. (Doc. 59, ¶ 48; Doc. 59-1, at 219-20). Dr. Rottmann also noted that Hubert was expected back in one week for a follow-up, but Hubert's records indicate he was a no show for the follow up. (Doc. 59, ¶ 48-49; Doc. 59-1, at 216-18).

Hubert returned to see Dr. Rottmann on November 4, 2019, for a blood pressure check, complaining also of waking up with a racing heart for two weeks, bad snoring, and sleepiness. (Doc. 59, ¶ 50; Doc. 59-1, at 214-15). At this time, Hubert weighed 211 pound which prompted Dr. Rottmann to assess Hubert for sleep apnea and hypertension related to his weight. (Doc. 59, ¶ 50; Doc. 59-1, at 214-15). Dr. Rottmann then scheduled a follow up and urged Hubert to lose weight. (Doc. 59, ¶ 50; Doc. 59-1, at 214-15).

Hubert saw Dr. Rottmann again on February 5, 2020, for a follow-up, during which Hubert's main concern was having a lot of daytime sleepiness. (Doc. 59, ¶ 55; Doc. 59-1, at 207-08). Dr. Rottmann noted Hubert had failed to lose weight, but that he walked into the room with normal gait without antalgic signs, sat calmly during the visit, had no signs of pain/discomfort during his visit, and had a neck circumference was seventeen cm. (Doc. 59, ¶ 55; Doc. 59-1, at 207-08). Dr. Rottmann's assessment was "most likely sleep apnea" and he noted that Hubert acknowledged understanding his explanation about the benefits of undergoing a sleep study and losing weight including less heart strain. (Doc. 59, ¶ 55; Doc. 59-1, at 207-08). According to the medical records, Hubert agreed to lose weight, as the benefits outweighed the risks and because he desired to proceed with Dr. Rottmann's plan.

(Doc. 59, ¶ 55; Doc. 59-1, at 207-08). Dr. Rottmann directed Hubert to go to sick call if his symptoms were worsened and informed him of what symptoms to look for. (Doc. 59, ¶ 55; Doc. 59-1, at 207-08). At the end of the visit, Dr. Rottmann placed a consult request for Hubert to be seen for a Pulmonary visit on February 25, 2020, and noted that Hubert was having daytime sleepiness and had failed to lose weight. (Doc. 59, ¶ 56; Doc. 59-1, at 334-36). On February 25, 2020, Hubert was admitted to the Infirmary for a sleep study and Dr. Rottmann approved the admission on February 26, 2020. (Doc. 63, ¶ 56; Doc. 59-1, at 366).

On August 24, 2020, Hubert requested a steroid inhaler from Dr. Rottmann during a sick call. (Doc. 59, ¶ 73; Doc. 59-1, at 152-53). Hubert had been prescribed Xopenex six months prior, but his prescription had been discontinued for noncompliance as Hubert did not use it. (Doc. 59, ¶ 73; Doc. 59-1, at 152-53). Hubert promised to be compliant this time and complained that he had experienced coughing and breathing trouble in the past couple of months and desired relief. (Doc. 59, ¶ 73; Doc. 59-1, at 152-53). On examination, Hubert's appearance, mentation, and gait were within normal limits, and he had no discomfort or labored breathing. (Doc. 59, ¶ 73; Doc. 59-1, at 152-53). Dr. Rottmann prescribed Hubert an Xopenex inhaler and scheduled him for chronic care. (Doc. 59, ¶ 73; Doc. 59-1, at 152-53).

Four days later, on August 28, 2020, Dr. Rottmann saw Hubert again on sick call, and this time Hubert again complained of breathing and snoring issues and stated he did not get his medications. (Doc. 59, ¶ 74; Doc. 59-1, at 150-51). Hubert expressed that, because he didn't get his medication, he was going to write a grievance. (Doc. 59, ¶ 74; Doc. 59-1, at 150-51). Dr. Rottmann examined Hubert, noting he was calm, comfortable, breathing normally, and had a normal gait. (Doc. 59, ¶ 74; Doc. 59-1, at 150-51). He assessed that Hubert had asthma with intermittent symptoms. (Doc. 59, ¶ 74; Doc. 59-1, at 150-51). Dr. Rottmann's

treatment plan was to have a Xopenex inhaler and medications delivered to Hubert, if they were not already delivered. (Doc. 59, ¶ 74; Doc. 59-1, at 150-51). Dr. Rottmann then instructed Hubert to write a sick call slip if his symptoms continued and told him the proper procedures for medical refills. (Doc. 59, ¶ 74; Doc. 59-1, at 150-51).

### 3. Boguslaw's Examinations of Hubert

On October 25, 2018, Hubert was seen by Boguslaw, complaining that he was unable to use the bathroom and had foul smelling diarrhea six to seven times per week. (Doc. 59, ¶ 18; Doc. 59-1, at 298-99). Hubert reported that he had taken Cleocin two weeks ago for an abscess and reported intermittent fevers mostly at night. (Doc. 59, ¶ 18; Doc. 59-1, at 298-99). During Boguslaw's examination, she reviewed his chart and found Hubert was alert, awake, oriented, not in apparent distress, and ambulating with a steady even gait and no guarding. (Doc. 59, ¶ 18; Doc. 59-1, at 298-99). Her assessment was possible Clostridioides difficile ("C. diff") and she created a plan to treat or otherwise rule out C. diff. (Doc. 59, ¶ 18; Doc. 59-1, at 298-99). She prescribed Hubert Ciprofloxacin and Metronidazole and instructed him to return to care if his symptoms persisted. (Doc. 59, ¶ 18; Doc. 59-1, at 298-99).

On November 26, 2018, Boguslaw wrote a progress note, as follows:

> Presented to sick call complaining of his med line for Bentyl being changed from line 3 to line 4. States it only helps when given at line 3 with meals. Reviewed sapphire, medication was initially written by MD 10/8/18 and med line was changed by nursing to line 3 on 10/23/18 then back to line 4 on 11/23/18 as there is not a line 3 med line. Upon review of sapphire patient is only 44% compliant with this medication making it of little benefit regardless of when he is taking it. It can't be argued he isn't taking it on line 4 as his noncompliance was prior to the med-line change and many of the no shows were on lines 1 and 2. Prior to 10/8/18 The medication was written only for TWICE a day and at that time he was only 54% compliant. The Rx was increased to 3x daily and patient became LESS compliant. The matter was discussed at length with the MD, the CHCA, and this

provider and as the patient has been noncompliant and there is no therapeutic benefit without compliance regardless of medication line, the medication will be discontinued.

(Doc. 59, ¶ 23; Doc. 59-1, at 291).

Boguslaw's plan following this appointment was for Hubert to be seen on the MD/PA line and to discontinue his Bentyl prescription. (Doc. 59, ¶ 23; Doc. 59-1, at 291).

Hubert saw Boguslaw again on January 17, 2019, this time complaining of a lump under his left axilla, a firm mass approximately 3 cm x 1 cm with a creased area. (Doc. 59, ¶ 26; Doc. 59-1, at 286-87). Boguslaw believed the lump to be hidradenitis and prescribed Hubert Doxycycline Mono 100 mg and educated him on disease care and maintenance. (Doc. 59, ¶ 26; Doc. 59-1, at 286-87).

On July 9, 2019, Boguslaw saw Hubert again, noting that his chart had been reviewed, and that Hubert was medically cleared for Nicotine Replacement Therapy. (Doc. 59, ¶ 42; Doc. 59-1, at 243).

On September 23, 2019, Boguslaw saw Hubert to address complaints about coughing and wheezing with inhalation for about a week. (Doc. 59, ¶ 45; Doc. 59-1, at 234-36). During the examination, Hubert was alert, awake, oriented, not in apparent distress, and his bilateral lungs were clear to auscultation without egophony, his throat had no lymphadenopathy, he had no tonsillar edema and/or exudate, and his ear canals were patent and without erythema. (Doc. 59, ¶ 45; Doc. 59-1, at 234-36). Boguslaw's assessment was allergic rhinitis and cough and she prescribed Hubert Benzonatate and Hydroxyzine HCL. (Doc. 59, ¶ 45; Doc. 59-1, at 234-36).

On January 17, 2020, Boguslaw saw Hubert for review and because of his non-compliance with taking Bentyl. (Doc. 59, ¶ 54; Doc. 59-1, at 208-09). At the visit, Hubert

stated he takes his medication as needed for his abdominal pain. (Doc. 59, ¶ 54; Doc. 59-1, at 208-09). At the examination, while Hubert was not in apparent distress, his demeanor was confrontational. (Doc. 59, ¶ 54; Doc. 59-1, at 208-09). Boguslaw observed Hubert's chart and noted that he had been seen by a gastrointestinal medic and general surgery for abdominal and rectal pain, and that his exams were within normal limit, with the exception of a Levator spasm during colonoscopy. (Doc. 59, ¶ 54; Doc. 59-1, at 208-09). Boguslaw further noted that Hubert's Bentyl compliance was less than 50%. (Doc. 59, ¶ 54; Doc. 59-1, at 208-09).

On February 13, 2020, Boguslaw saw Hubert on a sick call, during which he complained of tightness in his chest and around his back, lethargy, and issues catching his breath. (Doc. 59, ¶ 62; Doc. 59-1, at 194-95). Hubert told Boguslaw that he had come down to get his inhalers and was told that he had been removed from the pulmonary clinic. (Doc. 59, ¶ 62; Doc. 59-1, at 194-95). On examination, Hubert's peak expiratory flow rate was 550, he was not in apparent distress, had no issues amputating, had easy speech, and had an unremarkable head, ears, eyes, nose, and throat, normal heart, and clear bilateral lungs with no wheezes, rates, egophony, nor cough present. (Doc. 59, ¶ 62; Doc. 59-1, at 194-95). Boguslaw hoped to rule out viral illness. (Doc. 59, ¶ 62; Doc. 59-1, at 194-95). She advised Hubert that he had a stable respiratory status. (Doc. 59, ¶ 62; Doc. 59-1, at 194-95). She also educated Hubert about the need to decrease his sodium intake, noting he was currently eating a lot of sodium from the commissary, and Hubert agreed to adjust his diet. (Doc. 59, ¶ 62; Doc. 59-1, at 194-95). Boguslaw noted that she would revisit his blood pressure medication prescription dose at the next clinic if his elevated diastolic blood pressure persisted. (Doc. 59, ¶ 62; Doc. 59-1, at 194-95).

During an examination on May 26, 2020, Hubert asked Boguslaw if he could see an optometrist. (Doc. 59, ¶ 67; Doc. 59-1, at 176-77). Boguslaw arranged the appointment. (Doc. 59, ¶ 67; Doc. 59-1, at 176-77).

On July 6, 2020, Boguslaw examined Hubert at a sick call during which he complained his eczema and hidradenitis were flaring up. (Doc. 59, ¶ 69; Doc. 59-1, at 165-66). Boguslaw observed that Hubert's right axilla had apparent tunnelling, that Hubert showed no visible signs of discomfort, and that Hubert had a firm indurated area and his chest and biceps with mild hyperpigmented the popular rash. (Doc. 59, ¶ 69; Doc. 59-1, at 165-66). Boguslaw's assessment was unspecified skin and hidradenitis and she prescribed Hubert Doxycycline mono and Triamcinolone 0.025% Cream as treatment, directing him to follow up on as needed or if his symptoms worsened. (Doc. 59, ¶ 69; Doc. 59-1, at 165-66).

On July 30, 2020, Boguslaw saw Hubert at another sick call, during which Hubert requested Motrin, claiming the commissary had been out of stock for several weeks and he was experiencing joint pain at his surgical sites. (Doc. 59, ¶ 70; Doc. 59-1, at 163-64). On examination, Boguslaw determined Hubert was not in apparent distress, that he was ambulatory, and that he bent and kneeled without difficulty, grimaces, nor guarding as he looked through his footlocker. (Doc. 59, ¶ 70; Doc. 59-1, at 163-64). Boguslaw's assessment was unspecified pain and she prescribed Hubert Ibuprofen until he could get Motrin from the commissary. (Doc. 59, ¶ 70; Doc. 59-1, at 163-64).

On August 4, 2020, Hubert came again to Boguslaw on a sick call, complaining that even after his sleep study in February he was still tired in the morning, snoring loudly, and waking up coughing like he is choking and feeling like he cannot breathe. (Doc. 59, ¶ 71; Doc. 59-1, at 160-62). On examination, Hubert was not in apparent distress, was awake, alert, and

oriented, and had a study gait. (Doc. 59, ¶ 71; Doc. 59-1, at 160-62). Boguslaw informed Hubert that his sleep study revealed no indication he needed a CPAP at that time. (Doc. 59, ¶ 71; Doc. 59-1, at 160-62). Hubert's nose was positive for congestion with pallor but no erythema, his throat had mild erythema with paroxysmal nocturnal dyspnea ("PND"), he had no tonsillar edema, his heart was normal, his bilateral lungs were clear to auscultation, and his extremities had no edema and were well perfused. (Doc. 59, ¶ 71; Doc. 59-1, at 160-62). Boguslaw's assessment was hypertension and she wanted to rule out rhinitis. (Doc. 59, ¶ 71; Doc. 59-1, at 160-62). Boguslaw prescribed Hubert Hydroxyzine19 and Loratadine, ordered that his blood pressure be checked every evening, and directed him to follow up for a review of his blood pressure in two weeks. (Doc. 59, ¶ 71; Doc. 59-1, at 160-62).

On November 30, 2020, Boguslaw saw Hubert on sick call, during which he requested Aleve for his joint and lower back pain because it was out of stock at the commissary. (Doc. 59, ¶ 90; Doc. 59-1, at 113-14). Hubert was in no apparent distress, ambulated without difficulty, had no gait dysfunction, and limping or guarding was present. (Doc. 59, ¶ 90; Doc. 59-1, at 113-14). Boguslaw's assessment was unspecified pain and she prescribed him Naproxen, noting Hubert had a history of dyspepsia and took a high dose of a proton pump inhibitor for gastroesophageal reflux disease. (Doc. 59, ¶ 90; Doc. 59-1, at 113-14).

### 4. Dr. Moclock's Examinations of Hubert

On October 8, 2018, Dr. Moclock saw Hubert at the Hypertension ("HTN") & Cardiac and Pulmonary Chronic Care Clinics ("CCC"). (Doc. 59, ¶ 17; Doc. 59-1, at 300-06). Dr. Moclock examined Hubert, noting his general appearance, skin, and neck were normal. (Doc. 59, ¶ 17; Doc. 59-1, at 300-06). He also noted that Hubert had good blood pressure, unchanged hypertension status, and improved asthma to be considered "moderate persistent asthma."

(Doc. 59, ¶ 17; Doc. 59-1, at 300-06). Dr. Moclock renewed Hubert's medication, educated him on the disease process and smoking cessation, scheduled him for re-check with new lab work in six months, changed Hubert's Bentyl prescription to three times daily, noted that Hubert was still complaining of rectal pressure and discomfort, reviewed Hubert's labs, requested that Hubert be placed on a gastroesophageal reflux disease diet, and encouraged Hubert to stop smoking, to which Hubert responded that he cannot afford the patch. (Doc. 59, ¶ 17; Doc. 59-1, at 300-06).

On December 7, 2018, Dr. Moclock saw Hubert again for a follow-up to discuss noncompliance with his Bentyl prescription. (Doc. 59, ¶ 24; Doc. 59-1, at 289-90). Hubert told the doctor that there were only two pill lines, so he had to come down during a treatment line and that his dose was not being recorded. (Doc. 59, ¶ 24; Doc. 59-1, at 289-90). Dr. Moclock assessed Hubert for irritable bowel syndrome and reinstated his Bentyl prescription at to be taken three times daily, noting that he was to continue to go down for breakfast, lunch, and dinner for his medications. (Doc. 59, ¶ 24; Doc. 59-1, at 289-90). Dr. Moclock also refilled Hubert's Dibucaine. (Doc. 59, ¶ 24; Doc. 59-1, at 289-90).

On April 9, 2019, Dr. Moclock saw Hubert at the HTN & Cardiac and the CCC, where Hubert reported having never been hospitalized before his incarceration. (Doc. 59, ¶ 34; Doc. 59-1, at 261-67). Hubert also shared that his family history of HTN, coronary artery disease, asthma, chronic obstructive pulmonary disease, and other pulmonary was unknown to him. (Doc. 59, ¶ 34; Doc. 59-1, at 261-67). Hubert told Dr. Moclock that he has asthma that is triggered less than two days per week, nightmare awakenings less than two times per month, that he uses his SABA Rescue inhaler less than two days per week, and that there is no interference with respect to his activities of daily living. (Doc. 59, ¶ 34; Doc. 59-1, at 261-67).

18

At this visit, Dr. Moclock noted Hubert's vitals were stable, and that his general appearance, skin, head, ears, nose, throat, and neck were normal. (Doc. 59, ¶ 34; Doc. 59-1, at 261-67). Dr. Moclock's assessment was hypertension and cardiac diagnosis, noting that Hubert had good blood pressure, unchanged hypertension status, and that he had an improved asthma status, and mild persistent asthma classification. (Doc. 59, ¶ 34; Doc. 59-1, at 261-67). Per his treatment plan, Dr. Moclock renewed Hubert's medication, educated him on the disease process, and discussed the unpredictable nature of IBS and how it can negatively impact a person's activities of daily living. (Doc. 59, ¶ 34; Doc. 59-1, at 261-67). Dr. Moclock also ordered Hubert Fibercon. (Doc. 59, ¶ 34; Doc. 59-1, at 261-67).

### 5. Brian Davis's Examinations of Hubert

According to his medical records, Hubert first saw physician assistant Brian Davis ("Davis") on July 6, 2018. (Doc. 59, ¶ 6, Doc. 59-1, at 321). Hubert was complaining of coughing and chest pain. (Doc. 59, ¶ 6, Doc. 59-1, 321). Davis gave Hubert Guaifenesin, an over-the-counter medication used to clear mucosal sinus and chest congestion, and determined Hubert had bronchitis. (Doc. 59, ¶ 6; Doc. 59-1, at 321). On examination, Davis indicated that Hubert was not in apparent distress, that his vitals were stable, and that his heart sounds were regular. (Doc. 59, ¶ 6; Doc. 59-1, at 321). The plan was to prescribe Hubert a Z-pak and prednisone, but Davis also encouraged Hubert to stop smoking. (Doc. 59, ¶ 6; Doc. 59-1, at 321).

Hubert saw Davis again on October 3, 2018. (Doc. 59, ¶ 16; Doc. 59-1, at 309-10). Hubert complained of an abscess in his left armpit. (Doc. 59, ¶ 16; Doc. 59-1, at 309-10). Davis planned to give Hubert Toradol and prescribe him Clindamycin to be taken three times

per day for five days and encouraged Hubert to use warm compresses. (Doc. 59, ¶ 16; Doc. 59-1, at 309-10).

On November 5, 2018, Hubert was seen by Elizabeth Snyder, RN ("Snyder") for triage, who noted that a block officer reported that Hubert was doubled over in pain and needed to be seen by medical. (Doc. 59, ¶ 19; Doc. 59-1, at 297). Hubert was transferred to medical via cart. (Doc. 59, ¶ 19; Doc. 59-1, at 297). Hubert complained that his rectum and left leg hurt and Snyder's assessment was alteration in comfort. (Doc. 59, ¶ 19; Doc. 59-1, at 297). This brought Hubert again to Davis, who found Hubert's abdomen was soft and tender over his left lower quadrant. (Doc. 59, ¶ 20; Doc. 59-1, at 295-96). Davis, desiring to rule out gastrointestinal bleeding, planned to give Hubert hemoccult slides and check his complete blood count and comprehensive medical panel in the morning. (Doc. 59, ¶ 20; Doc. 59-1, at 295-96). Following this, Davis ordered Hubert's panel and lab tests for his abdominal pain to rule out gastrointestinal bleeding. (Doc. 59, ¶ 20; Doc. 59-1, at 295-96).

Hubert followed up on the lump on his left axilla with Davis on January 18, 2019, complaining it still hurt a lot. (Doc. 59, ¶ 27; Doc. 59-1, at 284-85). Davis noted that Hubert had started Doxycycline that day and that while Hubert was not in distress, his left axilla was positive for tenderness with induration and no drainage. (Doc. 59, ¶ 27; Doc. 59-1, at 284-85). Davis reassured Hubert, encouraged him to use warm compresses, and advised he would give him Motrin 600 mg four times daily for five days. (Doc. 59, ¶ 27; Doc. 59-1, at 284-85). Hubert saw Davis again on January 21, 2019, complaining of the same pain in his left axilla. (Doc. 59, ¶ 28; Doc. 59-1, at 282-83). During this second examination, Davis reviewed Hubert's chart and noted that while Hubert was not in apparent distress, he had a raised area noted in his left axilla with purulent drainage and tenderness. (Doc. 59, ¶ 28; Doc. 59-1, at

282-83). Davis's assessment was an abscess and arranged for Hubert to continue his doxycycline. (Doc. 59, ¶ 28; Doc. 59-1, at 282-83). Davis also again encouraged Hubert to use warm compresses, directed him to return to care if no improvement, and gave him six large bandages. (Doc. 59, ¶ 28; Doc. 59-1, at 282-83).

Hubert saw Davis on March 14, 2019, this time for "diet noncompliance." (Doc. 59, ¶ 29; Doc. 59-1, at 280-81). Hubert was on the gastroesophageal reflux disease diet but had missed sixty-one meals. (Doc. 59, ¶ 29; Doc. 59-1, at 280-81). Davis completed a Therapeutic Diet Rules Form which Hubert executed and then ordered Hubert a therapeutic diet during twenty-three-hour observation in the Infirmary. (Doc. 59, ¶ 29; Doc. 59-1, at 280-81). Per the Order, Hubert was placed on a standard/regular clear liquid diet, with his vitals to be checked and a practitioner called if Hubert experienced nausea, vomiting, or worsening of his condition. (Doc. 59, ¶ 29; Doc. 59-1, at 278-79, 280-81).

On March 30, 2019, Davis saw Hubert in the Infirmary and Hubert reported his main concern was rectal discomfort and his history of rectal spasms. (Doc. 59, ¶ 31; Doc. 59-1, at 271-72). On examination, Hubert was alert, awake, oriented, not in acute distress, his skin was warm and dry, he was afebrile, his vitals were stable, examination of his abdomen revealed that it was soft, non-tender, had no masses, Hubert had golden urine, and bowel sounds in all four quadrants. (Doc. 59, ¶ 31; Doc. 59-1, at 271-72). Davis assessed that Hubert was constipated and he gave Hubert Toradol to manage his rectal pain complaint. (Doc. 59, ¶ 31; Doc. 59-1, at 271-72). Hubert then returned to general population. (Doc. 59, ¶ 31; Doc. 59-1, at 271-72).

After missing about sixty-four gastroesophageal reflux disease meals in about a month, Hubert saw Davis again on June 6, 2019, and was warned his diet would be discontinued if

Hubert continued to miss meals and be non-compliant. (Doc. 59, ¶ 38; Doc. 59-1, at 253-54). On June 7, 2019, Hubert's gastroesophageal reflux disease diet was discontinued for non-compliance and the kitchen was informed. (Doc. 59, ¶ 39; Doc. 59-1, at 253-54).

On February 5, 2020, Davis saw Hubert to address complaints about Hubert's glasses being two years old. (Doc. 59, ¶ 57; Doc. 59-1, at 204-05). Hubert requested to see optometry to be evaluated for a new pair. (Doc. 59, ¶ 57; Doc. 59-1, at 204-05). On examination, Hubert was not in apparent distress. (Doc. 59, ¶ 57; Doc. 59-1, at 204-05). Davis reviewed the chart and put in a referral to the optometry clinic to evaluate him for a new prescription. (Doc. 59, ¶ 57; Doc. 59-1, at 204-05).

On March 16, 2020, Davis saw Hubert regarding chest tightness he claimed to have experienced over the last two months and coughing up yellow mucus. (Doc. 59, ¶ 66; Doc. 59-1, at 177-78). Hubert also reported he had a diagnosis of asthma. (Doc. 59, ¶ 66; Doc. 59-1, at 177-78). Davis observed that Hubert was in no apparent distress, his bilateral lungs were clear to auscultation, and his heart sounds were regular. (Doc. 59, ¶ 66; Doc. 59-1, at 177-78). Davis's assessment was to rule out bronchitis. (Doc. 59, ¶ 66; Doc. 59-1, at 177-78). Davis prescribed Hubert a Z-pack and Guaifenesin and encouraged Hubert to increase his fluids and directed him to return to care if he experiences no improvement. (Doc. 59, ¶ 66; Doc. 59-1, at 177-78).

On August 19, 2020, Davis followed up with Hubert regarding his blood pressure. (Doc. 59, ¶ 72; Doc. 59-1, at 154-55). Davis reviewed Hubert's chart and examined him, noting he was in no apparent distress and his blood pressure was average. (Doc. 59, ¶ 72; Doc. 59-1, at 154-55). Concerning Hubert's asthma, Davis noted that he was not compliant with all his prescriptions and had not refilled them. (Doc. 59, ¶ 72; Doc. 59-1, at 154-55). Davis's

assessment was hypertension due to Hubert's noncompliance with his prescription. (Doc. 59, ¶ 72; Doc. 59-1, at 154-55). Davis tried to explain to Hubert how to refill his medications, but Hubert got angry and walked away from the cell door and laid back down on his bunk. (Doc. 59, ¶ 72; Doc. 59-1, at 154-55). Davis noted he would not make any changes since Hubert was "obviously not taking what was prescribed to him." (Doc. 59, ¶ 72; Doc. 59-1, at 154-55).

On September 1, 2020, Hubert was seen by Davis again for a follow up, and Hubert complained of shortness of breath and reported using Xopenex. (Doc. 59, ¶ 76; Doc. 59-1, at 144-45). Davis noted that Hubert was not in acute distress, had no respiratory distress, had stable vitals, that his lungs had scattered wheezes at the bases, and that his heart sounds were regular. (Doc. 59, ¶ 76; Doc. 59-1, at 144-45). Davis's assessment was bronchitis. (Doc. 59, ¶ 76; Doc. 59-1, at 144-45). Davis created a plan to add an Alvesco inhaler to Hubert's prescriptions and get a chest X-ray. (Doc. 59, ¶ 76; Doc. 59-1, at 144-45). Davis educated Hubert about his next steps. (Doc. 59, ¶ 76; Doc. 59-1, at 144-45). Thereafter, Davis ordered a chest X-ray for shortness of breath and to rule out bronchitis. (Doc. 59, ¶ 76; Doc. 59-1, at 143).

On May 19, 2021, Davis saw Hubert to address Hubert's right hand/wrist pain after he had fallen on his outstretched arm. (Doc. 59, ¶ 97; Doc. 59-1, at 100-01). On examination, Hubert was in no acute distress, and Davis noted that Hubert's right wrist and hand did not have gross deformity or ecchymosis, but that there was a decreased range of motion and some tenderness over the distal ulna. (Doc. 59, ¶ 97; Doc. 59-1, at 100-01). Davis's assessment was wrist sprain, and he ordered Hubert an X-ray to rule out a fracture, gave Hubert an ACE wrap for support and some Motrin for discomfort. (Doc. 59, ¶ 97; Doc. 59-1, at 100-01). On May

24, 2021, Hubert's right wrist was X-rayed and the results came back normal. (Doc. 59, ¶ 100; Doc. 59-1, at 351-52).

On May 26, 2021, Davis saw Hubert on the block due to Covid restrictions. (Doc. 59, ¶ 101; Doc. 59-1, at 91-92). Hubert wanted to know the results of his X-ray and requested more Motrin. (Doc. 59, ¶ 101; Doc. 59-1, at 91-92). Hubert complained, "it hurts if I bend it or rotate it a certain way." (Doc. 59, ¶ 101; Doc. 59-1, at 91-92). During the examination, Hubert was in no acute distress and was resting comfortably. (Doc. 59, ¶ 101; Doc. 59-1, at 91-92). Davis advised that the results of Hubert's X-ray did not show any acute fractures or other abnormality, and his assessment was wrist sprain. (Doc. 59, ¶ 101; Doc. 59-1, at 91-92). Davis educated Hubert on his next steps and informed him that he would prescribe him Motrin. (Doc. 59, ¶ 101; Doc. 59-1, at 91-92). Davis also encouraged Hubert to perform range of motion exercises. (Doc. 59, ¶ 101; Doc. 59-1, at 91-92).

On August 19, 2021, Davis again saw Hubert on the block, this time to address Hubert's complaints of chest tightness, coughing and sinus congestion. (Doc. 59, ¶ 117; Doc. 59-1, at 66-67). On examination, Hubert was in no apparent distress, his vitals were stable, both lungs were clear, and his heart sounds were regular with no respiratory distress. (Doc. 59, ¶ 117; Doc. 59-1, at 66-67). Hubert was able to have a full conversation without difficulty. (Doc. 59, ¶ 117; Doc. 59-1, at 66-67). Davis's assessment was upper respiratory infection or early bronchitis, and he prescribed Hubert Zithromax and Motrin, directing him to return to care if he did not see any improvement. (Doc. 59, ¶ 117; Doc. 59-1, at 66-67).

On November 22, 2021, Davis saw Hubert to address Hubert's nasal congestion. (Doc. 59, ¶ 124; Doc. 59-1, at 54-55). On examination, Hubert was not in apparent distress, was medically well, his nares looked clear and there was no noted discharge. (Doc. 59, ¶ 124; Doc.

59-1, at 54-55). Also, Hubert's bilateral lungs were clear, and his heart sounds were regular. (Doc. 59, ¶ 124; Doc. 59-1, at 54-55). Davis's assessment was nasal congestion and he started Hubert on Prednisone, provided education, and encouraged Hubert to stay well-hydrated. (Doc. 59, ¶ 124; Doc. 59-1, at 54-55).

On December 13, 2021, Davis ordered Hubert a chest X-ray due to shortness of breath and pain with breathing. (Doc. 59, ¶ 126; Doc. 59-1, at 51-52). Hubert complained of pain in the center of his chest and expressed that when he took deep breaths, it made the pain worse. (Doc. 59, ¶ 126; Doc. 59-1, at 51-52). Hubert denied having any cough, fever, chills, or sweats. (Doc. 59, ¶ 126; Doc. 59-1, at 51-52). Davis also noted that Hubert has known asthma and was previously on Protonix for acid reflux. (Doc. 59, ¶ 126; Doc. 59-1, at 51-52). On examination, Hubert was in no apparent distress and his pharynx was clear, bilateral lungs were clear, and heart sounds were regular. (Doc. 59, ¶ 126; Doc. 59-1, at 51-52). Davis's assessment was asthma, possibly bronchospasm, and gastroesophageal reflux disease, and the plan was to check Hubert's chest X-ray and restart Singulair and Protonix. (Doc. 59, ¶ 126; Doc. 59-1, at 51-52). Davis educated Hubert on this plan. (Doc. 59, ¶ 126; Doc. 59-1, at 51-52).

On December 29, 2021, Davis reviewed Hubert's X-ray report and noted there were no acute cardiopulmonary findings. (Doc. 59, ¶ 130; Doc. 59-1, at 44). On December 30, 2021, Hubert complained to Davis, "I don't know, I just feel funny all over. I have this swelling, like this on the inside, you can't see it but I can feel it." (Doc. 59, ¶ 131; Doc. 59-1, at 43). Davis noted that Hubert was seen in triage and complaining of feeling "off." (Doc. 59, ¶ 131; Doc. 59-1, at 43). On examination, Hubert was alert and oriented and able to ambulate independently and his vitals were stable, lungs had clear sounds, and his heart rate was

regular. (Doc. 59, ¶ 131; Doc. 59-1, at 43). Hubert was sent back to his block and Davis noted that Mr. Ackerman saw him during triage and no sick call was needed. (Doc. 59, ¶ 131; Doc. 59-1, at 43).

### 6. Stewart Ackerman's Examinations of Hubert

On June 16, 2021, Hubert was seen on the block by physician's assistant Stewart Ackerman ("Ackerman") for a sick call. (Doc. 59, ¶ 105; Doc. 59-1, at 87-88). Hubert complained of pain in his right wrist, which has been ongoing for the past four weeks, and Ackerman noted that Hubert's X-ray of his right wrist had been unremarkable. (Doc. 59, ¶ 105; Doc. 59-1, at 87-88). On examination, Hubert was alert and oriented, he was standing and ambulating without difficulty, he carried on conversation without any visible signs of shortness of breath, and he had no nasal congestion or audible wheezing. (Doc. 59, ¶ 105; Doc. 59-1, at 87-88). Further examination showed Hubert's hands had reproducible pain along fourth and fifth tendons and were negative for Phalen and Tinel's signs. (Doc. 59, ¶ 105; Doc. 59-1, at 87-88). Ackerman's assessment was tendonitis. (Doc. 59, ¶ 105; Doc. 59-1, at 87-88). Ackerman provided Hubert reassurance and educated him on self-care measures, prescribed him Tylenol, referred him to a physical therapist, and instructed him to notify medical if his symptoms did not resolve. (Doc. 59, ¶ 105; Doc. 59-1, at 87-88).

On June 16, 2021, Ackerman placed a request for Hubert to be seen at an onsite physical therapy consultation. (Doc. 59, ¶ 106; Doc. 59-1, at 328). Per the comments, Ackerman noted that Hubert had a four-week history of tendonitis which affected his right fourth and fifth tendons. (Doc. 59, ¶ 106; Doc. 59-1, at 328). On June 25, 2021, Hubert was seen by the physical therapist with respect to his right wrist complaint and upon examination, Hubert's pronation was 90 degrees, wrist flexion and extension were within normal limits, his

supination was 40 degrees with pain, his range of motion of all digits was within normal limits, and his right grip strength was 4/5. (Doc. 59, ¶ 107; Doc. 59-1, at 349). Hubert reported increased pain with radial/ulnar deviation. (Doc. 59, ¶ 107; Doc. 59-1, at 349). The physical therapist's assessment was suspected ligamentous injury of the right wrist and Hubert was instructed to continue to use an ACE wrap, exercise as tolerable, potentially get an MRI, and to wear a wrist brace. (Doc. 59, ¶ 107; Doc. 59-1, at 349).

On July 13, 2021, Ackerman saw Hubert on the block for sick call because of Covid-19 movement restrictions. (Doc. 59, ¶ 108; Doc. 59-1, at 84-86). Hubert complained of discomfort in his wrist and Ackerman noted that Hubert had previously been evaluated, provided an ACE, and had been referred to physical therapy. (Doc. 59, ¶ 108; Doc. 59-1, at 84-86). Hubert requested to see the physical therapist again and reported paresthesia in his right fifth finger. (Doc. 59, ¶ 108; Doc. 59-1, at 84-86). Hubert also provided that he was awaiting a wrist brace but that he was no longer using his ACE wrap. (Doc. 59, ¶ 108; Doc. 59-1, at 84-86). Further examination showed Hubert's hands had negative Tinel's sign, no appreciated point tenderness, that his range of motion was limited by pain, but had no swelling, deformities, or abnormalities. (Doc. 59, ¶ 108; Doc. 59-1, at 84-86). Ackerman's assessment was paresthesia and he both provided Hubert reassurance and educated him on self-care measures. (Doc. 59, ¶ 108; Doc. 59-1, at 84-86). No change in therapy was indicated at that time, and Hubert was instructed to notify medical should he not have a resolution of his symptoms. (Doc. 59, ¶ 108; Doc. 59-1, at 84-86). Ackerman also directed Hubert to follow up as needed and Hubert was also scheduled for a follow-up on the provider line for a right wrist brace per the physical therapist's recommendation. (Doc. 59, ¶ 108; Doc. 59-1, at 84-86).

On July 20, 2021, Ackerman placed a request for Hubert to be seen by an onsite physical therapy consult for a one-month follow-up. (Doc. 59, ¶ 110; Doc. 59-1, at 325-27). The physical therapist saw Hubert on July 30, 2021. (Doc. 59, ¶ 113; Doc. 59-1, at 348). The physical therapist's assessment was persisting pain and they instructed Hubert to continue performing all exercises as instructed and suggested considering an ortho consult. (Doc. 59, ¶ 113; Doc. 59-1, at 348). Hubert then received a temporary right large carpal tunnel brace. (Doc. 59, ¶ 114; Doc. 59-1, at 70-71).

On September 12, 2021, Ackerman saw Hubert on the block for sick call due to Covid-19 movement restrictions. (Doc. 59, ¶ 121; Doc. 59-1, at 61-63). Hubert complained of sinus pressure, postnasal drip, and subsequent cough, providing that these symptoms had been ongoing for several days. (Doc. 59, ¶ 121; Doc. 59-1, at 61-63). Hubert denied having any of the classic symptoms of Covid-19. (Doc. 59, ¶ 121; Doc. 59-1, at 61-63). On examination, Hubert was alert and oriented, not in apparent distress, standing and ambulating without difficulty, able to carry on a conversation, had no visible signs of shortness of breath, nasal congestion, audible wheezing, did not have any neck anterior or posterior lymphadenopathy, his thyroid did not appear enlarged, he had no erythema exudate noted at his mouth, and had normal bilateral hearing. (Doc. 59, ¶ 121; Doc. 59-1, at 61-63). Ackerman's assessment was sinusitis and he reassured and educated Hubert on self-care measures, prescribed him Tylenol and Guaifenesin, and instructed him to obtain further doses of medication from the commissary and to notify medical should he not have a resolution of his symptoms. (Doc. 59, ¶ 121; Doc. 59-1, at 61-63). Ackerman also directed Hubert to follow up on an as needed basis. (Doc. 59, ¶ 121; Doc. 59-1, at 61-63).

On December 16, 2021, Hubert underwent a chest X-ray. (Doc. 59, ¶ 127; Doc. 59-1, at 341). The X-ray was compared to his September 3, 2020 X-ray, and was medically unremarkable. (Doc. 59, ¶ 127; Doc. 59-1, at 341). Hubert's cardiomediastinal silhouette was not enlarged and there was no evidence of focal consolidation in his lungs, vascular redistribution, no pleural fluids and no radiographic evidence of active tuberculosis. (Doc. 59, ¶ 127; Doc. 59-1, at 341). Hubert's bony structures were intact, there were no foreign bodies, and no tubes/lines/implantable devices and there was no radiographic evidence of acute cardiopulmonary disease. (Doc. 59, ¶ 127; Doc. 59-1, at 341).

On December 21, 2021, Ackerman saw Hubert for a sick call. (Doc. 59, ¶ 128; Doc. 59-1, at 48-50). Hubert complained of jaw swelling and stated he deliberately let the infection go for a month because he had "a lot of issues with antibiotics and I know that I need to let the infection get bigger so that the antibiotics will actually work." (Doc. 59, ¶ 128; Doc. 59-1, at 48-50). Ackerman noted that, even considering this, Hubert did not submit a sick call slip and instead complained to staff. (Doc. 59, ¶ 128; Doc. 59-1, at 48-50). Hubert denied fever, chills, coughs, shortness of breath, fatigue, headache, shortness of breath, fatigue, headache, myalgia, loss of taste, loss of smell, sore throat, sinus congestion, runny nose, nausea, vomiting, and diarrhea. (Doc. 59, ¶ 128; Doc. 59-1, at 48-50). On examination, he was alert and oriented, in no apparent distress, standing and ambulating without difficulty, was able to carry on a conversation, and had no visible signs of shortness of breath, and nasal congestion. (Doc. 59, ¶ 128; Doc. 59-1, at 48-50). Hubert had an infected hair follicle on the left side of his jaw with an abscess approximately 1.5 cm. (Doc. 59, ¶ 128; Doc. 59-1, at 48-50). Hubert did not have any neck anterior or posterior lymphadenopathy, his thyroid did not appear enlarged, he had no erythema exudate noted at his mouth, and had normal bilateral hearing.

(Doc. 59, ¶ 128; Doc. 59-1, at 48-50). Ackerman's assessment was that Hubert had an infected hair follicle and he educated Hubert on self-care measures, prescribed him Cipro and Motrin, and instructed him to purchase further doses of medication from the commissary and to notify medical should he not have any resolution of his symptoms. (Doc. 59, ¶ 128; Doc. 59-1, at 48-50). Ackerman also directed Hubert to follow up on an as needed basis. (Doc. 59, ¶ 128; Doc. 59-1, at 48-50).

On December 30, 2021, Hubert complained to Ackerman that he was experiencing symptoms where he just did not feel right and did not feel as though he has returned to normal following being infected with what he believed was Covid-19. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). However, Hubert had never notified medical about potentially having Covid-19 and had never been diagnosed with Covid-19. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). Hubert told Ackerman he had not been able to fully return to his previous level of activities but, on examination, he was alert and oriented, not in apparent distress, standing and ambulating without difficulty, able to carry on conversation, and had no visible signs of shortness of breath, nasal congestion, audible wheezing, or coughing. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). Hubert's heart had regular rate and rhythm and no murmur. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). Hubert's bilateral lungs were clear to auscultation, and he had no wheezing. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). Ackerman noted that Hubert's December 16, 2021, chest X-ray was normal. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). Ackerman's assessment was that Hubert was experiencing symptoms consistent with post-Covid syndrome, even though Hubert was never officially diagnosed with Covid-19. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). Per the plan, Ackerman provided Hubert reassurance and educated him on self-care measures. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). Ackerman noted there was no change in

therapy indicated at this time, and directed Hubert to notify medical should he not have any resolution of his symptoms. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42). He also directed Hubert to return for follow-up care on an as needed basis. (Doc. 59, ¶ 132; Doc. 59-1, at 40-42).

### 7.  Hubert's Dental Appointments

On April 16, 2019, October 17, 2019, November 19, 2019, October 26, 2020, May 21, 2021, May 24, 2021, July 19, 2021, July 26, 2021, July 27, 2021, November 12, 2021, and November 15, 2021, Hubert received dental treatment. (Doc. 59, ¶¶ 35, 47, 51, 84, 98, 99, 109, 111, 112, 122, 123; Doc. 59-1, at 56-60, 78-83, 93-98, at 123-25, 229-32, 212-13, 257-58, 259-60, 343-45).  On June 20, 2019, Hubert was refused his dental appointment and he requested that Correctional Officer Mark have him sent down to sign a refusal. (Doc. 59, ¶ 41; Doc. 59-1, at 244).  On May 21, 2021, Brent Mervin Baily, DMD placed a request for Hubert to be seen for an onsite office visit with Oral and Maxillofacial Surgery on July 27, 2021. (Doc. 59, ¶ 98; Doc. 59-1, at 331-33). Hubert was referred to Dr. Pepper for extraction of his tooth #32. (Doc. 59, ¶ 98; Doc. 59-1, at 331-33).

### 8.  Other Appointments

On August 10, 2018, Hubert refused his Dicyclomine prescription, which is a brand of the drug Dicycloverine, a gut antispasmodic used to treat irritable bowel symptoms. (Doc. 59, ¶ 7; Doc. 59-1, at 319-320).  On August 17, 2018, Hubert had blood drawn by Phlebotomist Jill Auman ("Auman") for his lipid, prolactin, complete blood count, and basic metabolic panel lab tests. (Doc. 59, ¶ 8; Doc. 59-1, at 318). On August 18, 2018, Hubert was a no show for an EKG. (Doc. 59, ¶ 9; Doc. 59-1, at 317). On August 25, 2018, Hubert was a no show for another EKG, and it rescheduled for September 1. (Doc. 59, ¶ 10; Doc. 59-1, at 316). On August 29, 2018, Hubert was a no show for sick call. (Doc. 59, ¶ 11; Doc. 59-1, at 315). On

September 4, 2018, Kelly Ann Mirolli, RN noted in Hubert's chart that his EKG was being rescheduled due to a lockdown. (Doc. 59, ¶ 12; Doc. 59-1, at 314). On September 11, 2018, Hubert's blood was drawn by Auman for his complete blood count, and basic metabolic panel lab tests. (Doc. 59, ¶ 13; Doc. 59-1, at 313).

On September 19, 2018, Hubert was seen by Leah Rumbel, LPN in medical, complaining of feeling "extra tired" and dizzy. (Doc. 59, ¶ 14; Doc. 59-1, at 312). On examination, Hubert's vitals were stable, he exhibited no signs nor symptoms of distress, and his respirations were easy on room air. (Doc. 59, ¶ 14; Doc. 59-1, at 312). Rumbel's assessment was altered health status and complaints a dizziness, and she instructed Hubert to submit a sick call to be further evaluated by a provider with verbal understanding from Hubert. (Doc. 59, ¶ 14; Doc. 59-1, at 312). On September 15, 2018, Hubert's EKG was completed. (Doc. 59, ¶ 15; Doc. 59-1, at 311).

On November 15, 2018, Blanche Milo, RN noted in Hubert's medical chart:

> Search team confiscated medications belonging to inmate Hubert in another inmate's cell this AM. The medications turned in are: (14) Ciprofloxacin 500mg tablets and (9) metronidazole 500mg tablets, which were prescribed to inmate Hubert on 10-25-18 by Ms. Boguslaw. Ms. Boguslaw confirmed the prescribed medications and was able to confirm the prescription date. Search team was alerted to the original prescribed inmate.

> (Doc. 59, ¶¶ 21-22; Doc. 59-1, at 292).

On January 8, 2019, Hubert was seen by Heather Grossnickle, RN, who spoke with him about his medication noncompliance and informed him that noncompliance would cause a possible deterioration with mental health conditions. (i.e., auditory/visual hallucinations, increased thoughts of suicidal/homicidal ideation, etc.). (Doc. 59, ¶ 25; Doc. 59-1, at 288).

On March 30, 2019, Hubert was seen by Kevin Meitzler, RN ("Meitzler") in the Infirmary after a call came from Hubert's block reporting he had "no bowel movements since Tuesday" and "no urinating since 6 o'clock this morning." (Doc. 59, ¶ 30; Doc. 59-1, at 276-77). Meitzler noted that Hubert had reported a history of gastrointestinal issues, no bowel movements since Tuesday, and no voiding since 6 A.M. and that, on examination, Hubert was awake, alert, and oriented. (Doc. 59, ¶ 30; Doc. 59-1, at 276-77). Meitzler observed that Hubert's vitals were stable, bowel were sounds normal, abdomen was non-distended, and that Hubert felt slight pain to lower quadrant and no pain in his bladder, no verbalized or exhibited pain while walking to medical, no acute distress, but Hubert was nonetheless brought to Infirmary overnight for observation. (Doc. 59, ¶ 30; Doc. 59-1, at 276-77). When Meitzler asked Hubert why he did not contact medical today, his response was, "I know I have an appointment soon to discuss my Bentyl," and Meitzler educated Hubert to use sick call for future issues. (Doc. 59, ¶ 30; Doc. 59-1, at 276-77). Meitzler assessed that Hubert had a knowledge deficit related to not contacting medical in a timely manner and made a plan for Hubert to continue to be monitored in the Infirmary, for Hubert to continue his liquid diet, and for his vitals to be checked on every shift. (Doc. 59, ¶ 30; Doc. 59-1, at 276-77). Meitzler rounded on him a couple more times that day and briefly noted that Hubert did not report any vomiting nor nausea. (Doc. 59, ¶ 30; Doc. 59-1, at 276-77).

On March 30, 2019, Hubert was seen by Adam Kritzer, RN ("Kritzer") on rounds during his twenty-three hour observation in the Infirmary for possible constipation/urinary retention. (Doc. 59, ¶ 32; Doc. 59-1, at 270). Per the record, Hubert had a 10 P.M. or 6 A.M. block call reporting last bowel movement on March 26, but had no complaints at that time of the visit. (Doc. 59, ¶ 32; Doc. 59-1, at 270). On examination, Hubert was alert, awake,

oriented, and not in acute distress, and his vitals were stable. (Doc. 59, ¶ 32; Doc. 59-1, at 270). Kritzer also observed that Hubert was non-distended, had bowel sounds present in all four quadrants, no nausea/vomiting, no reported bowel movements, and concentrated yellow urine. (Doc. 59, ¶ 32; Doc. 59-1, at 270). Kritzer indicated that Davis had previously evaluated Hubert and that Hubert "and wants to discharge [from infirmary], awaiting orders, 60 mg Toradol IM given per order. educated on Toradol." (Doc. 59, ¶ 32; Doc. 59-1, at 270).

On April 2, 2019, Hubert was seen by Russell Miller, PA, complaining of increased abdominal spasms, watery diarrhea multiple times per day sometimes with bright red blood, no emesis, coughing with green sputum with a few specs of blood, and wheezing for two weeks. (Doc. 59, ¶ 33; Doc. 59-1, at 268-69). Hubert complained that his Bentyl ran out and that he missed the pill line a few times because of school. (Doc. 59, ¶ 33; Doc. 59-1, at 268-69). Miller also noted that Hubert is a smoker, has a past medical history of Chron's, and had left sided abdominal pain. (Doc. 59, ¶ 33; Doc. 59-1, at 268-69). On examination, Hubert was alert with no distress and his lungs had mild expiratory wheezing, heart had regular rate and rhythm, and the left upper and lower quadrants of his abdominal were tender. (Doc. 59, ¶ 33; Doc. 59-1, at 268-69). Miller's assessment was asthma, tobacco use, and Chron's disease. (Doc. 59, ¶ 33; Doc. 59-1, at 268-69). Miller also discussed steroid use, which Hubert expressed he would like to avoid if possible. (Doc. 59, ¶ 33; Doc. 59-1, at 268-69). Miller further advised that he would order DuoNeb three times daily, gave Hubert a Toradol injection, and renewed his Bentyl. (Doc. 59, ¶ 33; Doc. 59-1, at 268-69). Miller then directed Hubert to follow up as scheduled. (Doc. 59, ¶ 33; Doc. 59-1, at 268-69).

On May 3, 2019, Hubert executed a release indicating that he refused treatment for his irritable bowel syndrome and gastroesophageal reflux disease for religious reasons. (Doc. 59,

¶ 36; Doc. 59-1, at 256). On May 3, 2019, Heather Grossnickle, RN entered the following note in Hubert's chart:

> Spoke to inmate about suspending his psych medication for 30 days during Ramadan. He requested to have all of them changed to pill line number 4 during this time. Spoke to CRNP Bohner who stated that this is not an issue. This will change over Monday evening 5/6/2019.

(Doc. 59, ¶ 37; Doc. 59-1, at 255).

On June 11, 2019, Hubert received a Snellen visual acuity test. (Doc. 59, ¶ 40; Doc. 59-1, at 250).

On August 17, 2019, Amy Gardner, RN completed a Medical Release Summary on behalf of Hubert. (Doc. 59, ¶ 43; Doc. 59-1, at 240-42). On August 25, 2019, Hubert executed authorization for the release of his medical file to the Pennsylvania Board of Probation and Parole, Bureau of Community Corrections, and the Pennsylvania Department of Human Services. (Doc. 59, ¶ 44; Doc. 59-1, at 237-39).

On December 10, 2019, Janine Garancosky, LPN noted in Hubert's chart that he was a no show for a scheduled sick call. (Doc. 59, ¶ 53; Doc. 59-1, at 210).

On November 19, 2019, Barbara English noted in Hubert's medical chart that 345-pages of his medical records (dates January 2016 to present) were emailed to civil investigator Kimberly Garrity. (Doc. 59, ¶ 52; Doc. 59-1, at 211).

On February 10, 2020, Hubert was seen by Jacob Becker, RN ("Becker") for a burn from stinger water on his left middle finger. (Doc. 59, ¶ 58; Doc. 59-1, at 201-03). On examination, Hubert's vitals were stable, his respirations were normal, his pulse was 99, and his bilateral lung sounds were clear. (Doc. 59, ¶ 58; Doc. 59-1, at 201-03). Becker noted

Hubert's burn was observed to be one cm long, and that Hubert blisters. (Doc. 59, ¶ 58; Doc. 59-1, at 201-03). Becker's called for Hubert to be seen on next day sick call. (Doc. 59, ¶ 58; Doc. 59-1, at 201-03).

On February 11, 2020, Hubert was a no show for a sick call appointment with Kaila McManus, LPN but was seen the next day by RN Amy Gardner. (Doc. 59, ¶¶ 59-60; Doc. 59-1, at 196-200). Hubert had shown at medical complaining of shortness of breath. (Doc. 59, ¶¶ 59-60; Doc. 59-1, at 196-200). At the examination, Hubert reported he had a history of asthma and that he went down to medical earlier to get his inhaler but felt like his chest was tight and would not let up even with the use of his inhaler. (Doc. 59, ¶ 60; Doc. 59-1, at 196-199). He reported that movement and deep breathing made the tightness in his chest worse and more painful. (Doc. 59, ¶ 60; Doc. 59-1, at 196-199). Hubert denied any associated coughs, fever, chills, cardiac disease, and pulmonary disease and on examination, Hubert's vitals were stable and he denied having shortness of breath, but wheezing was present in Hubert's chest and lungs. (Doc. 59, ¶ 60; Doc. 59-1, at 196-199). Amy Gardner's assessment was chest tightness with slight wheezing in the lower bilateral lobes and Hubert was given treatment and scheduled to be seen at next day sick call. (Doc. 59, ¶ 60; Doc. 59-1, at 196-199).

On February 13, 2020, Hubert was seen by Kevin Hill, RN ("Hill"), who noted that a block officer had reported Hubert was having problems breathing but that medical responded to his block to find Hubert sitting erect, alert and verbal, talking without signs or symptoms of shortness of breath. (Doc. 59, ¶ 61; Doc. 59-1, at 193). Hubert claimed he had experiencing breathing problems the day before and was not currently having problems breathing but did have tightness in his chest with breaths and a forced dry cough which he said he had for days.

(Doc. 59, ¶ 61; Doc. 59-1, at 193). Hill checked Hubert's lungs, noting they were clear, that his oxygen saturation was 98%, and that he had a peak flow of 550 and thereafter Hubert was transported to medical to be assessed and placed on the bench to be seen in sick call. (Doc. 59, ¶ 61; Doc. 59-1, at 193). Hill's assessment was discomfort related to chest tightness and coughing and he made plan for Hubert to be evaluated by the provider in sick call. (Doc. 59, ¶ 61; Doc. 59-1, at 193).

On March 12, 2020, Auman noted in Hubert's medical chart that he had refused to sign a refusal of treatment against medical advice form. (Doc. 59, ¶ 64; Doc. 59-1, at 185, 186-87). Per the record, an officer had to be called because Hubert got upset when Auman tried to explain the process to get back on to see the eye doctor. (Doc. 59, ¶ 64; Doc. 59-1, at 185, 186-87). Accordingly, Auman executed a Release from Responsibility, which was subsequently approved by Dr. Rottmann. (Doc. 59, ¶ 64; Doc. 59-1, at 185, 186-87).

On March 14, 2020, Snyder saw Hubert for an Asthma Exacerbation and, per the record, Hubert complained of shortness of breath and coughing and tightness in his chest while stating he had an unlisted history of asthma. (Doc. 59, ¶ 65; Doc. 59-1, at 179-84). Snyder planned for a follow up for this issue on sick call. (Doc. 59, ¶ 65; Doc. 59-1, at 179-84). Snyder noted that Hubert's symptoms were precipitated by smoking. (Doc. 59, ¶ 65; Doc. 59-1, at 179-84). On examination, Hubert's vitals were stable and Snyder noted Hubert was breathing room air, his bilateral lungs were clear to auscultation with a flow of 450, and had an oxygen saturation level of 96%. (Doc. 59, ¶ 65; Doc. 59-1, at 179-84). She noted Hubert was not in any acute distress, that his respirations were normal, and then she made a plan for Hubert to be seen at next day sick all. (Doc. 59, ¶ 65; Doc. 59-1, at 179-84).

On June 11, 2020, Meitzler completed a Medical Release Summary and on June 15, 2020, Hubert executed an authorization for the release of his information (i.e., a medical release summary for his records dated June 10, 2013 through December 8, 2020) to the Pennsylvania Bureau of Probation and Parole for continuity of care/community placement. (Doc. 59, ¶ 68; Doc. 59-1, at 172-74; 362-64). On June 16, 2020, Hubert consented to the release of his information to the Pennsylvania Bureau of Probation and Parole. (Doc. 59, ¶ 68; Doc. 59-1, at 167-69).

On August 31, 2020, Hubert complained to Linda Jones, RN ("Jones") that he had not felt good for several months and easily got short of breath, felt tired, and the right side of his back was tight when he woke up. (Doc. 59, ¶ 75; Doc. 59-1, at 146-49). Hubert also reported that he had a diagnosis of asthma in the past and requested another inhaler because he had two different types in the past. (Doc. 59, ¶ 75; Doc. 59-1, at 146-49). He reported that his symptoms began on February 1, 2020, and that his shortness of breath came and went no matter what he did. (Doc. 59, ¶ 75; Doc. 59-1, at 146-49). Hubert denied chest pain, coughs, fever, chills, or cardiac disease. (Doc. 59, ¶ 75; Doc. 59-1, at 146-49). Hubert reported that he uses a Xopenex inhaler. (Doc. 59, ¶ 75; Doc. 59-1, at 146-49). On examination, Hubert's vitals were stable with no signs of cyanosis. (Doc. 59, ¶ 75; Doc. 59-1, at 146-49). Jones's assessment of Hubert was that he had a knowledge deficit related to his pulmonary medication and she instructed Hubert to discuss diagnosis and medication with the doctor and scheduled him for a follow-up with the provider at next day's sick call. (Doc. 59, ¶ 75; Doc. 59-1, at 146-49).

On September 3, 2020, Hubert underwent a chest X-ray, which came back normal. (Doc. 59, ¶ 77; Doc. 59-1, at 361). Hubert's cardiomediastinal silhouette was not enlarged, there was no evidence of focal consolidation, vascular redistribution, or pleural fluids in his

lungs, there was radiographic evidence of active tuberculosis, Hubert's bony structures were intact, there were no foreign bodies, and no tubes/lines/implantable devices detected. (Doc. 59, ¶ 77; Doc. 59-1, at 361). Per the Impression, there was no radiographic evidence of acute cardiopulmonary disease. (Doc. 59, ¶ 77; Doc. 59-1, at 361).

On September 9, 2020, Snyder saw Hubert for shortness of breath that became worse when climbing stairs. (Doc. 59, ¶ 78; Doc. 59-1, at 139-42). Hubert also complained he had sleep apnea and needed a CPAP machine so he could sleep, but denied having chest pain, cough, fever, chills, and cardiac disease. (Doc. 59, ¶ 78; Doc. 59-1, at 139-42). Hubert disclosed that he used an Alvesco Inhaler twice daily and a Xopenex Inhaler four times daily. (Doc. 59, ¶ 78; Doc. 59-1, at 139-42). On examination, Jones noted that Hubert's vitals were stable, he did not have shortness of breath that prevented him from speaking full sentences, was not using accessory (neck and shoulder) muscles to breathe, and no sign of cyanosis. (Doc. 59, ¶ 78; Doc. 59-1, at 139-42). Hubert was scheduled for next day sick call to address his complaints and review of his chest X-ray. (Doc. 59, ¶ 78; Doc. 59-1, at 139-42).

On September 22, 2020, when CRNP Isaias Vargas ("Vargas") saw Hubert on his block, Hubert shared, "I'm still having issues with my breathing, shortness of breath, low energy, some wheezing, headaches, chest pain two times using regular inhaler up to four." (Doc. 59, ¶ 79; Doc. 59-1, at 137-38). Hubert was alert and oriented no respiratory or physical distress. (Doc. 59, ¶ 79; Doc. 59-1, at 137-38). Vargas's assessment was asthma, and Vargas prescribed Hubert Singulair for intermittent asthma and told Hubert follow up on the Provider Line, unless already scheduled. (Doc. 59, ¶ 79; Doc. 59-1, at 137-38).

On September 29, 2020, Dr. McClure saw Hubert at the CCC and ordered him a routine electrocardiogram due to hypertension. (Doc. 59, ¶ 81; Doc. 59-1, at 130-35, 136).

Hubert reported that his asthma was triggered by allergies, season change, and stress, and that he was experiencing triggers more than two days per week, was awakened from sleep less than two times per month and that he used his inhaler less than two days per week. (Doc. 59, ¶ 81; Doc. 59-1, at 130-35). On examination, Hubert's vital signs were stable and he was in no apparent distress. (Doc. 59, ¶ 81; Doc. 59-1, at 130-35). Dr. McClure renewed Hubert's medication and educated him on asthma, medication compliance, exercise, and symptom management. (Doc. 59, ¶ 81; Doc. 59-1, at 130-35).

On October 5, 2020, Vargas saw Hubert again, who requested something for hidradenitis in his armpits and a stronger medication for muscle pain. (Doc. 59, ¶ 82; Doc. 59-1, at 126-27). On examination, Hubert's bilateral armpits appeared swollen but had no discharge. (Doc. 59, ¶ 82; Doc. 59-1, at 126-27). Vargas's assessment was hidradenitis and he prescribed Hubert Acetaminophen and Cefaclor. (Doc. 59, ¶ 82; Doc. 59-1, at 126-27).

On October 21, 2020 Hubert refused the flu vaccine, and on October 29, 2020, he tested positive for Covid-19. (Doc. 59, ¶¶ 83, 85; Doc. 59-1, at 360, 122).

On November 2, 2020, Hubert complained to Vargas that he was seen by the doctor on Friday and given Ibuprofen and cough medicine, but that the order was never received, no one in medical knew of it, and he wanted to be seen as soon as possible. (Doc. 59, ¶ 86; Doc. 59-1, at 120-21). On examination, Hubert's lungs were clear and no other distress was noted, but Hubert had swollen areas in his armpits. (Doc. 59, ¶ 86; Doc. 59-1, at 120-21). Vargas's assessment was hidradenitis and cough and prescribed Acetaminophen to be taken for a month, Cefaclor to be taken for a week, and Mucosa to be taken for two weeks. (Doc. 59, ¶ 86; Doc. 59-1, at 120-21). Vargas noted that he could not prescribe Motrin due to allergies to Cox-2 inhibitors. (Doc. 59, ¶ 86; Doc. 59-1, at 120-21).

On November 4, 2020, Dr. McClure saw Hubert in the Infirmary regarding a request for a refill of Hubert's Inhalers and Tessalon for cough. (Doc. 59, ¶ 87; Doc. 59-1, at 117-19). On November 5, 2020, Dr. McClure entered a nursing order in Hubert's chart, directing that an Alvesco Inhaler be delivered to Hubert in exchange for his old inhaler. (Doc. 59, ¶ 88; Doc. 59-1, at 115-16). On November 9, 2020, Hubert was cleared to work for the food service. (Doc. 59, ¶ 89; Doc. 59-1, at 338).

On January 12, 2021, Miller saw Hubert regarding a fall out of bed. (Doc. 59, ¶ 91; Doc. 59-1, at 158-59). Miller examined Hubert, noting he had a tender left fifth finger digit, he could not extend the fingertip, had no obvious deformity, and had mild edema to his finger, with diffuse tenderness. (Doc. 59, ¶ 91; Doc. 59-1, at 158-59). Hubert had full range of motion, a tender ulna, and no edema or ecchymosis. (Doc. 59, ¶ 91; Doc. 59-1, at 158-59). Miller's assessment was contusion of left hand/fifth finger with a possible tendon tear from the fingertip and he made a treatment plan to X-ray Hubert's hand, wrist, and forearm. (Doc. 59, ¶ 91; Doc. 59-1, at 158-59). Miller prescribed Hubert Naprosyn to be taken twice per day for pain on an as needed basis, and buddy tape Hubert's finger until the results of his X-ray came back. (Doc. 59, ¶ 91; Doc. 59-1, at 158-59). Hubert's X-ray of his left forearm and wrist took place on January 14, 2021. (Doc. 59, ¶ 92; Doc. 59-1, at 355-59). It came back normal, without evidence of fracture. (Doc. 59, ¶ 92; Doc. 59-1, at 355-59). Hubert was informed of his X-ray results on January 19, 2021, and responded "Thanks for letting me know." (Doc. 59, ¶ 93; Doc. 59-1, at 108-09).

On March 30, 2021, Hubert received an eye exam. (Doc. 59, ¶ 94; Doc. 59-1, at 103-07).

Per an April 1, 2021 Progress Note, Jones answered a block call to BB Block because Hubert reported that he felt tired, felt that the right side of his back was tight when he woke up that day, and was reporting that he had not felt good for several months. (Doc. 59, ¶ 95; Doc. 59-1, at 102). Jones examined Hubert, noting that his vitals were stable and that his lungs were clear to auscultation. (Doc. 59, ¶ 95; Doc. 59-1, at 102). Jones instructed Hubert to sign up for sick call. (Doc. 59, ¶ 95; Doc. 59-1, at 102).

On May 3, 2021, Hubert refused the Janssen Covid-19 vaccine. (Doc. 59, ¶ 96; Doc. 59-1, at 353). On June 1, 2021, Hubert refused the Janssen Covid-19 vaccine for a second time. (Doc. 59, ¶ 102; Doc. 59-1, at 350).

On June 4, 2021, Hubert was triaged by Becker. (Doc. 59, ¶ 103; Doc. 59-1, at 90). Hubert told Becker, "I hurt my foot playing basketball and it's changing colors." (Doc. 59, ¶ 103; Doc. 59-1, at 90). On examination, Becker noted Hubert had walked into medical without any issues and that while Hubert complained of pain and discoloration, no discoloration was evidenced. (Doc. 59, ¶ 103; Doc. 59-1, at 90). Becker observed that Hubert's strength was equal and appropriate in both legs, pedal pulses palpable, and no abnormality was noted. (Doc. 59, ¶ 103; Doc. 59-1, at 90). Becker's assessment was acute pain and he told Hubert to sign up for sick call. (Doc. 59, ¶ 103; Doc. 59-1, at 90). On June 7, 2021, Hubert declined sick call and told medical, "my foot is okay." (Doc. 59, ¶ 104; Doc. 59-1, at 89).

On August 16, 2021, Becker saw Hubert for triage again. (Doc. 59, ¶ 115; Doc. 59-1, at 69). Hubert was "not feeling well" which he attributed to having recently had a Covid-19 vaccination. (Doc. 59, ¶ 115; Doc. 59-1, at 69). On examination, Hubert was alert and oriented, independent in activities of daily living, ambulated on the block without any issues

and Becker's assessment was acute pain. (Doc. 59, ¶ 115; Doc. 59-1, at 69). Hubert was told to sign up for sick call. (Doc. 59, ¶ 115; Doc. 59-1, at 69).

Hubert received his first dose of the Moderna coronavirus vaccine on August 9, 2021. (Doc. 59, ¶ 118; Doc. 59-1, at 346-47). On August 18, 2021, Hubert was seen by Erin Gower, RN ("Gower"), in medical after being sent from the block for complaints of chest tightness and wheezing for a week. (Doc. 59, ¶ 116; Doc. 59-1, at 68). Per the record, Hubert was complained that, "I've been having wheezing and coughing up yellow stuff for like a week now. This is either a respiratory infection or maybe some kind of residual from the COVID shot." (Doc. 59, ¶ 116; Doc. 59-1, at 68). On examination, Hubert was alert and oriented, his vital signs were stable, no acute distress was noted, his bilateral lungs were clear to auscultation, and Gower told Hubert that he was not having side effects from the coronavirus vaccine. (Doc. 59, ¶ 116; Doc. 59-1, at 68). Hubert was added to the next day's sick call. (Doc. 59, ¶ 116; Doc. 59-1, at 68).

Hubert received his second dose of the Covid-19 vaccine on September 9, 2012. (Doc. 59, ¶ 118; Doc. 59-1, at 64-65).

On August 26, 2021, Dr. Benjamin Robinson referred Hubert for an August 27, 2021, onsite physical therapy consultation. (Doc. 59, ¶ 119; Doc. 59-1, at 322-24). At the appointment, the physical therapist noted that Hubert now had full range of motion both in pronation and supination, normal flexion and extension, all his digits within normal limits, and his right grip strength improved to normal 5/5. (Doc. 59, ¶ 120; Doc. 59-1, at 342). Hubert was instructed to continue all exercises twice a day for another thirty days. (Doc. 59, ¶ 120; Doc. 59-1, at 342).

On December 21, 2021, Hubert was seen by Hill for a "left jaw line boil." (Doc. 59, ¶ 129; Doc. 59-1, at 45-47). Hubert reported he felt it was growing for some time but was unsure of the exact date, and he also reported recurring boils on many different areas of his body in his lifetime. (Doc. 59, ¶ 129; Doc. 59-1, at 45-47). On examination, Hill noted Hubert's boil had no drainage, that Hubert did not have a history of diabetes, was not recently hospitalized, did not have recent contact with infected patients, was not recently diagnosed or treated for similar infections, and that Hubert's vitals were stable. (Doc. 59, ¶ 129; Doc. 59-1, at 45-47). Hill noted that Hubert's abscess was tense, had a three cm circumference, and was located from his left jaw line proximal to his ear. (Doc. 59, ¶ 129; Doc. 59-1, at 45-47). Hill's assessment was risk for discomfort related to his boil and per the plan, Hill noted that the referral may not be required if the following parameters were met by Hubert: (1) small, non-fluctuant abscess; (2) no drainage/pus; (3) afebrile; and (4) patient is immunocompromised, diabetic or on oral steroids. (Doc. 59, ¶ 129; Doc. 59-1, at 45-47). Hill directed Hubert to apply a warm compress to the area several times daily and noted Hubert was given medications Hill further noted that no referral was required, but he consulted Ackerman on this same date. (Doc. 59, ¶ 129; Doc. 59-1, at 45-47).

Throughout his incarceration, Hubert has received tuberculosis vaccinations. (Doc. 59, ¶ 133; Doc. 59-1, at 339).

## IV. DISCUSSION

### A. EIGHTH AMENDMENT VIOLATIONS

Both parties argue the merits of Hubert's Eighth Amendment claims in their briefs in support of their respective motions for summary judgment. (Doc. 53, at 1-8; Doc. 60, at 9-15). Hubert complains that Defendants violated his Eighth Amendment rights by delaying

and denying him medical care related to his asthma. (Doc. 53, at 1-5, 6-8). Defendants aver

that all the medical decisions made by Defendants were based on "sound professional medical

judgment," and must be reviewed in conjunction with the treatment and assessments of

Hubert's numerous other medical providers. (Doc. 60, at 9-12, 13, 15).

To sustain a claim under the Eighth Amendment for medical deliberate indifference

against Defendants, Hubert must plead facts that:

> [M]eet two requirements: (1) "the deprivation alleged must be objectively,
> sufficiently serious;" and (2) the "prison official must have a sufficiently
> culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970,
> 128 L.Ed.2d 811 (1994) (quotations marks and citations omitted). In prison
> condition cases, "that state of mind is one of 'deliberate indifference' to inmate
> health or safety." *Id.* "Deliberate indifference" is a subjective standard under
> Farmer—the prison official-defendant must actually have known or been aware
> of the excessive risk to inmate safety.

> *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).

These principles apply with particular force to Eighth Amendment claims premised upon

inadequate medical care. In the medical context, a constitutional violation under the Eighth

Amendment occurs only when state officials are deliberately indifferent to an inmate's serious

medical needs. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To establish a violation of his

constitutional right to adequate medical care in a prison setting, Brown is required to point to

evidence that demonstrates both (1) a serious medical need, and (2) acts or omissions by

prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d

192, 197 (3d Cir. 1999). A serious medical need is "one that has been diagnosed by a physician

as requiring treatment or one that is so obvious that a lay person would easily recognize the

necessity for a doctor's attention." *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326,

347 (3d Cir. 1987). Deliberate indifference to a serious medical need involves the

"unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. Such indifference may

be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or by "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or even negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. *Estelle*, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. *Clark v. Doe*, No. 99-CV-5616, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000) ("[C]ourts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference." *See e.g., Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.'); *Gindraw v. Dendler*, 967 F. Supp. 833, 836 (E.D. Pa. 1997).

Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received, particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. *See e.g., Ham v. Greer*, 269 F. App'x

149 (3d Cir. 2008); *James v. Dep't of Corrections*, 230 F. App'x 195 (3d. Cir. 2007); *Gillespie v. Hogan*, 182 F. App'x 103 (3d Cir. 2006); *Bronson v. White*, No. 05-CV-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); *Gindraw*, 967 F. Supp. 833. Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his ... care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . . [The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care . . . . Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

*James*, 230 F. App'x. at 197-198 (citations omitted).

In short, in the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional medical judgment. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)). Therefore, where a dispute in essence entails no more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference." *Gindraw*, 967 F. Supp. at 836 (citations omitted).

In reviewing the instant matter, the Court finds that Hubert has not presented sufficient evidence from which a reasonable jury could find that the Defendants acted with deliberate indifference to his medical needs. Contrary to his allegations, the record reveals that Hubert received a significant amount of care from both Dr. Rottmann and Boguslaw pertaining to his various medical afflictions, including his respiratory issues. (Doc. 59-1, at 113-14, 150-53, 160-62, 207-08, 208-29, 216-18, 219-20, 221-28 234-26, 243, 286-87, 291, 298-99). Regarding Dr. Rottmann, the record reflects that he treated Hubert's asthma on several occasions. (Doc. 59-1, 150-53, 207-08, 216-18, 219-20, 221-28). First, in 2019 Dr. Rottmann prescribed Hubert an inhaler despite Hubert's non-compliance with his previous asthma prescriptions. (Doc 59-1, at 152-53). Over the course of Hubert's respiratory care, Dr. Rottmann completed labs, ordered a sleep study, recommended Hubert lose weight, and told Hubert he could book an appointment at any time if his asthma symptoms, which Hubert reported were minimal, worsened. (Doc. 59-1, at 150-53). Also, according to his medical records, as of August 2020 Hubert still was not compliant with his asthma treatment plan and had failed to fill his prescriptions. (Doc. 59, ¶ 72; Doc. 59-1, at 154). Thus, even if Dr. Rottmann improperly discontinued Hubert's asthma treatment, an Eighth Amendment violation cannot be found in connection with his care given "the considerable latitude in the diagnosis and treatment of prisoners," Dr. Rottmann must be afforded and the significant amount of care he offered. *Estelle*, 429 U.S. at 106; *Clark,* 2000 WL 1522855, at *2.

Regarding Boguslaw, despite his claim that she had a "willful disregard for the health and safety of her patients," Hubert has provided no record evidence that Boguslaw's care was deficient. (Doc. 19, ¶ 28). Instead, the record reflects that Boguslaw saw and treated Hubert on numerous occasions, including for shortness of breath and chest tightness which Hubert

attributes to his asthma. (Doc. 59-1, at 113-14, 160-62, 171, 208-0, 234-36, 243, 286-87, 291, 298-99). In his brief, Hubert complains specifically about Boguslaw's care on February 13, 2020. (Doc. 53, at 6). However, Hubert's medical records reflect that Boguslaw saw on this day to address his asthma symptoms and that she indicated Hubert had a "knowledge deficit r/t Pulmonary Medication." [5] (Doc. 53, at 6; Doc. 59-1, at 149.) According to the documentation, Boguslaw educated Hubert about his asthma medication and discussed his prescriptions with him. (Doc. 59-1, at 149). Accordingly, the record again reflects that Boguslaw provided Hubert some significant level of medical. [6] *Clark,* 2000 WL 1522855, at *2.

Whereas Hubert may disagree with Defendants' handling of his symptoms, "[a]t most, [Hubert]'s allegations amount to medical malpractice; they are insufficient to establish a constitutional violation." *Warren v. PrimeCare Medical, Inc.*, No. 20-3561, 2022 WL 4244273, at *2 (3d Cir. Sept. 15, 2022); *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *see also McKinley v. Stanish*, No. 3:21-CV-00960, 2022 WL 4369974, at *8 (M.D. Pa. Sept. 21, 2022) (finding that an inmate's disagreement with his doctor's handling of his symptoms did not amount to an Eighth Amendment violation). The Court must defer to the judgment and expertise of medical providers, as the mere disagreement as to the proper medical treatment does not

---

[5] Hubert initiated this sick call because he had been experiencing shortness of breath and chest tightness "for several months." (Doc. 59-1, at 146).

[6] Additionally, as Defendants put it, Hubert did not see Boguslaw "in a vacuum," as he was also examined by various other medical professionals around this period regarding his respiratory symptoms who agreed with Boguslaw's assessment and aided in Hubert's care. (Doc. 59-1, at 146-49; 193).

COPY

support a claim of violation of the Eighth Amendment or deliberate indifference. *See Gindraw,* *967 F. Supp. at 836.* Accordingly, as Hubert has not submitted any evidence to contradict his medical records, Hubert's Eighth Amendment claims are **DISMISSED**.[7]

    B. <span style="font-variant: small-caps;">Medical Due Process Claim</span>

In his amended complaint, Hubert asserts Defendants violated his Fourteenth Amendment rights. (Doc 19, ¶ 25). Defendants contend this claim "appears to be a 'talismanic,' keyword-provoked invocation of the Fourteenth Amendment where there is no equal protection or due process claim." (Doc. 60, at 20). However, because Hubert does "then make reference to 'being removed from pulmonary clinic without due process,'" Defendants go on to argue that Hubert has "no due process interests with respect to whether he is enrolled in the pulmonary chronic clinic list or prescribed a medication, and this claim is utterly without merit." (Doc. 60, at 21-22).

Hubert does not argue the merits of his medical due process claim in his brief in support of his motion for summary judgment and he has not filed a brief in opposition to Defendants' motion for summary judgment. Thus, Hubert is deemed not to oppose Defendants' arguments. *See* Local Rule 7.6. However, because "the court must review the merits of defendant's summary judgment motion despite the fact that it is unopposed" and because the legal standard for proving a Due Process violation related to one's medical care

---

[7] To the extent that Hubert also argues that Dr. Rottmann was practicing without a medical license, there is no evidence in the record to support that claim, which is refuted by Defendants in their brief in opposition. (Doc. 53, at 6, 8; Doc. 63, 11-12). Additionally, Hubert points to his attached Exhibit J as evidence that Dr. Rottmann denied him care as a way to "cut corners." (Doc. 53, at 6; Doc. 55-9, at 30). Exhibit J is a news story that does not mention Dr. Rottmann or support the notion that Dr. Rottmann was personally motivated by the potential of a "kickback," while treating Hubert. (Doc. 53, at 6; Doc. 55-9, at 3).

in prison is the same as the deliberate indifference standard used to determine an Eighth Amendment violation, the Court may dismiss Hubert's medical due process claim on the merits in accordance with the analysis *supra*. *Purdy v. Pennsylvania Pub. Util. Comm'n*, No. CIV.A. 1:05CV1294, 2007 WL 3237458, at *1 (M.D. Pa. Oct. 30, 2007); *see Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997) (stating that to establish both an Eighth and Fourteenth Amendment violation a prisoner-plaintiff must provide there was deliberate indifference to their medical needs). Accordingly, Hubert's medical due process claim is **DISMISSED**.[8]

C. Negligence

In his amended complaint, Hubert asserts a medical negligence claim against Boguslaw. (Doc. 19, ¶ 28; Doc. 60, at 23). Defendants assert that because Hubert has filed a certificate of merit supplying his claims do not require expert testimony, he is barred from asserting this claim. (Doc. 60, at 23). The Court agrees.

In Pennsylvania, medical negligence, or medical malpractice, is defined as "the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) (citing *Hodgson v. Bigelow*, 7 A.2d 338 (Pa. 1939)). The existence of an injury, by

---

[8] In his amended complaint and his brief in support of his motion for summary judgment, Hubert alludes to SCI-Coal Township's mishandling of the Covid-19 pandemic. (Doc. 19, ¶¶ 13, 19, 20; Doc. 53, at 8). As his amended complaint does not directly relate these claims to either of the Defendants remaining in this case, the Court will not address these claims on the merits. The Court notes, however, that the record reflects that the medical department at SCI-Coal Township offered Hubert the Covid-19 vaccine multiple times, and he declined it twice before finally becoming vaccinated in August of 2021. (Doc. 59-1, at 346-47, 350, 353).

itself, does not prove a doctor's negligence. *Mitchell v. Shikora*, 209 A.3d 307, 315 (Pa. 2019) (citations omitted). To establish a cause of action for negligence under Pennsylvania law, a plaintiff must prove the following elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages. *See Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005) (citing *In re TMI*, 67 F.3d 1103, 1117 (3d Cir. 1995)).

Pennsylvania Rule of Civil Procedure 1042.3 requires a plaintiff alleging professional negligence to file a certificate of merit within 60 days of filing the complaint. Pa. R. Civ. P. 1042.3 The certificate must include one of the following: a written attestation by "an appropriate licensed professional" that there is a "reasonable probability that the care, skill or knowledge exercised or exhibited" by the defendant "fell outside acceptable professional standards," and that this was the cause of the plaintiff's injuries; a statement that the claim against the defendant is based only on the professional negligence of those for whom the defendant is responsible; or a statement that expert testimony is unnecessary for the plaintiffs claim to proceed. Pa. R. Civ. P. 1042.3(a)(1)-(3). Failure to file a certificate of merit is fatal to a plaintiffs claim. Pa. R. Civ. P. 1042.7. The requirements of Pa. R. Civ. P. 1042.3 are substantive in nature and, therefore, federal courts in Pennsylvania must apply these prerequisites of Pennsylvania law when assessing the merits of a medical malpractice claim. *See Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262-65 (3d Cir. 2011); *Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007).

In this case, Hubert did file a certificate of merit. (Doc. 20, at 5). Therein, Hubert states: "expert testimony of an appropriate licensed professional is un-necessary for the prosecution of this claim against [Boguslaw]." (Doc. 20, at 5). Thus, as he is bound to his certificate,

Hubert cannot call an expert to prosecute his claims against Boguslaw. Pa. R. Civ. P. 1042.3(a)(3) ("In the event that the attorney certifies under subdivision (a)(3) that an expert is unnecessary for prosecution of the claim, in the absence of exceptional circumstances the attorney is bound by the certification"). Hubert is therefore precluded from asserting a medical malpractice or negligence claim against Boguslaw. Pa. R. Civ. P. 1042.3(a)(3); *see Robles v. Casey*, No. 1:CV-10-2663, 2012 WL 6931971, at *17, *21 (M.D. Pa. Aug. 29, 2012), *report and recommendation adopted*, No. 1:10-CV-2663, 2013 WL 308699 (M.D. Pa. Jan. 25, 2013) (finding that a plaintiff was bound by the certificate of merit he filed stating that expert testimony was not necessary to support his claims and therefore he could not succeed on a medical malpractice claim). Accordingly, Hubert's negligence claim against Boguslaw is **DISMISSED**.

> ### D. Pennsylvania Constitution and Pennsylvania Civil Service Act Claims

Hubert alleges Defendants violated his rights under both the Pennsylvania State Constitution and the Civil Service Act. (Doc. 19, ¶ 25; Doc. 23, ¶ 1; Doc. 60, at 26). Defendants argue these claims should be dismissed because there is no private cause of against for damages against State actors under the Pennsylvania Constitution and or the Civil Service Act. (Doc. 60, at 27). Hubert does not discuss these claims in his motion for summary judgment and, as provided *supra*, has not filed a brief in opposition to Defendants' arguments. Accordingly, he is deemed not to oppose this argument. Nonetheless, the Court will review these claims on the merits as "the court must review the merits of [Hubert's] summary judgment motion despite the fact that it is unopposed." *Purdy*, 2007 WL 3237458, at *1.

"[N]either Pennsylvania state courts nor federal courts interpreting Pennsylvania law have recognized a private cause of action available under the Pennsylvania Constitution."

*Delgadillo v. Pennsylvania Dep't of Corr.*, No. 3:16-CV-00041, 2017 WL 1103182, at *8 (M.D. Pa. Feb. 6, 2017), *report and recommendation adopted*, No. CV 3:16-0041, 2017 WL 1079136 (M.D. Pa. Mar. 22, 2017); *see also Ryan v. General Mach. Prods.*, 277 F. Supp. 2d 585, 595 (E.D. Pa. 2003) ("[T]he federal courts in this Circuit that have considered the issue have concluded that there is no such right [to a private cause of action] under the Pennsylvania Constitution."). As such, Hubert cannot assert a private cause of action against Defendants under the Pennsylvania Constitution. Similarly, to the extent Hubert alleges a right of recovery pursuant to the Pennsylvania Civil Service Act, he has not established an enforceable private right of action for individuals who are not employed by the Commonwealth of Pennsylvania, the intended beneficiaries of its protections. *See Hubert v. Wetzel*, No. CV 18-354, 2018 WL 4828470, at *10 (W.D. Pa. Oct. 4, 2018) (dismissing a prisoner's claims under the Pennsylvania Civil Service Act because he was not a state employee and had failed to establish a private right of action under the Act). Accordingly, Hubert's claims against Defendants under the Pennsylvania Constitution and the Pennsylvania Civil Service Act are **DISMISSED**.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**, and Hubert's remaining claims are **DISMISSED**. (Doc. 58). In addition, Hubert's motion for summary judgment is **DENIED** and his motion to appoint counsel is **DENIED** as **MOOT**. (Doc. 51; Doc. 52).

An appropriate Order follows.

**Dated: January 26, 2024**                    *s/ Karoline Mehalchick*
                                                **KAROLINE MEHALCHICK**
                                                **Chief United States Magistrate Judge**

54